Morning is number 08-3306. Morgan against the Department of Energy. Mr. Sagerblum. Morning, Your Honor. I apologize. I woke up this morning with my ears are stuffed up, so if I appear to be not responsive, I'm just having a hard time hearing. I heard you fine just now, so I apologize for that. This is a whistleblower case that your court is somewhat familiar with because you've already issued one opinion in the case. My client was a whistleblower in Las Vegas back in the early 90s and challenged that action and ultimately prevailed in a decision in 1996, which was affirmed down the road and ended up being promoted retroactively from a GS-13 to a GS-14. Let me tell you what concerns me because one could say on its face it doesn't make sense that people didn't know that he had been a whistleblower and had been found and had been reinstated. But how do we overcome the credibility aspects of all of the quite frankly, Your Honor, that's why we're here. If there's not a mechanism to infer that knowledge, then someone can just stand there and say, I didn't know anything about it, then that's the end of the case, which is what the judge found. But if you look at the institution itself, Mr. Morgan's history as far as being basically stymied from back in the early 90s and then the fact that one of the people that was directly found to be one of the retaliators against him in the first action, his fingerprints are all over this particular action, unless you can infer from that into the person who made the decision, which is this Mrs. Eisele, then we can't. And that's where we're just kind of in a quandary. Was Mrs. Eisele an employee of the agency at the time of the whistleblowing statements? No. She was, but not there in Las Vegas. She transferred in. But what happened was, if you just look at this latest sequence, which was in the early part of an individual, the person that came in and noticed it to be recruited was one of these people who had been found against my client, Mr. Fiore. His name was on the actual recruitment to be filled. Mrs. Eisele was the person directly, was his subordinate. So it's Mrs. Eisele and Mr. Fiore. Mr. Fiore knows clearly because he was the retaliator. Mrs. Eisele says, I didn't know anything about it. But if you look at the paperwork, the two go hand in hand. And what we're saying is basically, how could you not, in those circumstances, if you have a higher level supervisor that intimately involved, how can you take out by just allowing her to say, I didn't know anything about it, how do you take the whistleblowing out of the equation? And I understand the difficulty, but it just begs credulity. She testified under oath, correct? Yes, she did. But it just kind of begs credulity, the fact that she could be having her immediate supervisor, who is evaluating her, for this position where my client's involved, just basically have no knowledge of it, and Mr. Fiore not have any input into making sure that my client was not selected. I wonder about that. I mean, there are lots of supervisors in the government, many layers of supervisors in the government, and it's not atypical for the hiring decisions to be made at one level and then a level up that the person who's supervising, the person who's doing the hiring, has no involvement in the hiring decisions as such. So I, just from my own experience, it strikes me as not necessarily counterintuitive that a supervisor would not be involved in, or even potentially aware of, the particular candidates for a position. What is there about this case that suggests to you that that's not the case? Several things. First, my client had been in the engineering division. First off, this is the Department of Energy in Las Vegas, which is in charge of the test site, nuclear test site there, but it's a pretty small group of people, a couple hundred people. My client had been... A couple of hundred. Yeah, total in the... It's a small federal workforce, but I couldn't think of that as a small office. Well, that included everybody. But anyway, so my client had been in the engineering division, and in the initial whistleblowing complaint, Mr. Fiore had been found guilty of taking him out of the engineering division in retaliation for his whistleblowing. That was in the first case in 1994, so this is like two years before this. Then, this particular recruitment, which is to go back and be the director of engineering, Mr. Fiore is actually the one who signed the document saying... Or didn't sign it, but his name was on the request to fill the position. Right. So it's not like he didn't know that they were going to be filling this position. Right. So the request to fill the position, so far... Yeah, his name is on there. Yeah, right. Okay. Then, the day they announced they're going to fill the position, they also transfer from another division into this position on a temporary detail, this Mr. Lawrence, which Mr. Fiore also signs off on, signs the paperwork saying... Lawrence listed Fiore as a reference. Yes, and then Fiore was one of his references. So, and Fiore was responsible for this reorganization of the NOVILLE in Nevada at the time. So, I mean, you could say, well, it was just one of the... He didn't know anything about it, but realistically, in my opinion, he was intimately involved in creating the position or the notice to fill it, transferring in this person the day that the position became available, and then a week later, the position was filled by the person that he transferred in there. Now, you could say, well, he didn't know anything about it, he didn't care about it, but when you look at that kind of detail, it's just... To me, anyway, it begs credulity that he would not have been intimately familiar and wanted to know who got that position. In fact, it looks like he picked Mr. Lawrence to get the position. Let's suppose that he did. Suppose that he decided, you know, Lawrence is my guy and I want Lawrence to have that position. That doesn't mean that he was even aware that Mr. Morgan was one of the applicants. No, and I grant you that. So now, we get over the first hurdle, which is he is involved in this process and Lawrence is his guy and he wants his guy there. Now, the question is, is that because he wants to make sure Morgan doesn't get it because he's anti-Morgan or it's just because Lawrence is a great guy and he wants Lawrence to have the position? Well, what's the evidence that he's aware of? Is there any evidence other than... Well, two things. First off, as I said, he's already been accused of taking Morgan out of engineering illegally. So, you could argue that he saw Morgan as someone who was on the chain of command coming up into the head of engineering and to get him out of that promotional opportunity, he took him out previously. Secondly, the Department of Engineering had been vacant for a year and there had been a promotional... It wasn't advertised permanently, but there was a one-year detail where it was advertised you could compete to get the position for a one-year detail. I guess it's the best words I could come up with. And Mr. Morgan had applied. He had not gotten the job, but he had expressed an interest even though he was not in the engineering department. So, there was that knowledge that he wanted that position on a temporary basis. But that doesn't connect up to Fiore. I'm sorry, what? You say there was some knowledge that your client was interested in the position, but that doesn't necessarily mean that Fiore knew that, correct? The question of Judge Bryson... And that question might have been answered if Fiore had testified. Right. And that's one of the things... I can understand why maybe you didn't want to call him. You were given the opportunity to call Fiore, but you elected not to do so. Right. Now, again, I'll just explain my trial strategy. To me, if you've got someone's fingerprints, clearly identified names or whatever, signatures, you don't, as the plaintiff or as the employee, you don't have to call them and say, are these your fingerprints? The fact is, just to have him call up and say, no, I never told Eizell what was happening, that really doesn't get you anywhere. And realistically, if he'd already denied, he'd retaliate against... I can understand, but your theory is that something really pretty sinister is going on in this office, and that Fiore is the, whatever you want to call him, who's got his thumb on the scale, who is hell-bent to make certain that your client wasn't going to get the job. But I don't... Really, to follow up on that, you didn't really make the case that Mr. Morgan was eminently well-qualified or better qualified than the person, than Lawrence, who did get the job. And isn't that, wouldn't that be a significant part of trying to penetrate all of these unknowns? We'd have to assume that some of the people who testified under oath were not forthcoming in terms of what they thought. But if, in fact, these people were at least equally qualified, or at least not sufficiently different to make a difference, it's very hard then to take this next step, is it not? Are you saying that that isn't a factor? No, and that is our final hurdle. And I appreciate what you're asking, or saying. And the reality is that, to that issue, then you go back and say, well, but for the whistleblowing, would he have been better qualified? And or, if you look below the surface, like the person that was selected, Mr. Lawrence, he was selected because he had this great supervisor experience, but he'd only been a supervisor since February, and this was in April. I mean, they basically fast-tracked this particular individual. So on paper, he had all this great stuff, but the fact is... Are you saying there is no substantial evidence to support the alternative holding? The alternative holding was, even if they'd known about the whistleblowing, they would have done the same thing anyhow, and you lose on that unless you can upset that. Well... Are you sort of saying that there was no substantial evidence to support that Exactly saying that. What I'm saying is that... How do you overcome it? Well, I mean, what happened was, Eisele said, well, if I hadn't picked Lawrence, I would have picked Thornton, which is the number two guy. But the reality is that choice never came up. So for the judge to lean on that defense and say, well, Mr. Thornton would have been picked anyway, so Mr. Morgan didn't lose anything... They had the scoring sheet. Didn't the scoring sheet show that your client didn't score very well with 10 or 12 candidates, right? Right. But if you look at the record, the record was, we're not allowed to create a scoring sheet. We're not allowed to create a ranking. And then, lo and behold, they have this number situation, which there's a dispute over who created the numbers and who followed it up. But I mean, there certainly is evidence to your question that would support that Mr. Thornton was higher ranking than my client. But to say... If the argument is, this guy was pre-selected for the job, and we went through all these machinations to get him, then to say, well, if we hadn't picked him, we would have picked somebody else, defeats kind of goes against our whole argument, which is, if we knock out the one guy, then we're back to square one. And we have to be able to say who really would have been the better candidate. Let's hear from the governor and we'll save you a rebuttal. All right. Thank you. May it please the court. This case is a fact bound case in which substantial evidence supports the administrative judge's findings. With respect to the knowledge issue that was the subject of questioning for petitioner's counsel, Ms. Eisel was the selecting official. She testified credibly according to the AJ. She started in the Nevada facility in January of 1995. So she was not at the facility from the early 90s when the earlier whistleblowing activities took place. The administrative... She testified that she had heard somewhere along the line about the whistleblowing events, right? No, your honor. That was Mr. Morelli, her deputy who testified that he had heard Paul talk, but nothing beyond that. But Ms. Eisel testified that she had no knowledge, had heard nothing about it. She denied knowing anything about it. Of all of the evidence and testimony that cannot be credible, how in a situation with the extraordinary situation of a whistleblower who goes through all of this litigation and after all of those years and all else gets reinstated, how can it be that the supervisory level in that relatively small establishment didn't know about it? She testified and was subject to cross-examination and the administrative judge found that she testified in detail about her knowledge or lack of it, how she didn't know Morgan at the time. There's no evidence... She did say that she eventually knew about it? No, her affidavit, your honor, in the discrimination complaint that was submitted in October 96 after the April 96 election was that she knew of, she had heard by then of Mr. Morgan and of his EEO complaints, but there was no, nothing in that affidavit that established that she knew about... We have no affidavit in our record? Yes, yes it is, your honor. That appendix starting 273, the administrative and Mr. Morgan's counsel attempted to impeach her testimony after she'd been excused as a witness, so as a trial strategy as his... Does the affidavit say when it was that she had heard, not had knowledge of the complaints that you just suggested a minute ago that it did, that's why I asked you. I'm sorry, no, the A.J. found that the affidavit did not say when, and in any event, petitioner's counsel attempted to impeach her credibility, but after she was excused as a witness, so that trial strategy along with the trial strategy of not calling Mr. Fiore is fatal. There is no evidence whatsoever that Mr. Fiore's fingerprints, so to speak, are all over this decision. Rather, the sworn testimony upon which the administrative judge relied was in detail by... What would happen if you had a situation, Ms. Vanderman, in which there were only two supervisory employees in an office, say Mr. Fiore and Ms. Eisel, okay? And we know that Mr. Fiore is tainted from previous occasions, and there are only two people in the office, and she testifies that, no, Mr. Fiore didn't... I didn't know anything about this. Mr. Fiore didn't tell me anything. Wouldn't that be a paradigm case of the problem that the presiding judge was trying to get at? And that common sense would tell you that the person who took the action, Ms. Eisel, has to have known? Not necessarily, Your Honor. I'm grasping forward whether there isn't... This may not be the case, but isn't there a fact situation out there somewhere where the request that Mr. Morgan's making here is that we sort of somehow create a mechanism for inferring the knowledge upstream to Fiore? If it was a two-person office, wouldn't it just belie all forms of common sense to hold there was no knowledge by... There could be such a case. The Frazier board DC circuit case that we cited talks about even if there's not knowledge, that perhaps if there was influence, that that could be a form of imputed knowledge, the theory upon which petitioner relies. But here there was evidence from Ms. Eisel that she never spoke with Mr. Fiore about the selection process, that he never tried to influence... No one ever tried to influence her decision. She created a methodology with scoring that was independent and objective. Mr. Morelli testified, the deputy, that it was not even a close call. The AJ found in footnote seven that even though ideally a ranking or scoring should not be used, there was nothing in the record to suggest that the use of scoring was anything other than an effort to identify the best person. Mr. Fiore was her direct supervisor, was he? Is that correct? At the time he was... Mr. Fiore was wearing many hats, but she testified that... And so did... He was or he was not her supervisor? He was up the found that on some of the things that Mr. Fiore signed off on, it was ministerial... He was or he was not her supervisor? He was not her direct first-line supervisor. Mr. Vaith was. And Mr. Vaith submitted an affidavit as well. And Ms. Eisel testified that Mr. Fiore was never involved in this selection process. She never discussed it with Mr. Fiore. He didn't know anything about it. This was sworn testimony. And ultimately the AJ gave the opportunity to petitioner's counsel a break during the testimony. Do you have any evidence? And they came back and said, no, we're speculating. We're trying to ask the AJ to create an inference that there was knowledge, but there's no evidence in the record of any... You're telling us that unlike any corporation that anyone ever heard of, unlike any government agency that anyone ever heard of, a high level, a very high level management position for which there are a number of qualified candidates, that that choice is directly in the hands of the immediate supervisor for that position and no one else is involved. It's not discussed with anyone else. The fact that this entire operation is going on is unknown. There's no interaction, no conversation. I mean... That's correct. That's what she testified. And that's what the paperwork... She said it was her choice. She didn't say that she didn't talk to anybody. The only person she testified, the only person she spoke with was Mr... She interviewed everybody and she selected Mr. Barnes. Yes, she interviewed everyone. She doesn't say she didn't discuss it with anyone else. She testified that the only person with whom she discussed it was Mr. Morelli, her deputy. That when her testimony is... Let's see. Start that page. Maybe the Department of Energy needs to take a look at how it manages its operations if these choices are important. Staffing choices are made without the interaction of the hierarchy. Your Honor, this was a very, as the AJ found, a very thorough process in which there was a vacancy in the announcement. And getting actually to one of the second issues, Mr. Lawrence, after all the written submissions of questions, the interviews that the panel members wrote notes about, Ms. Eisele interviews of the 10 candidates, a weighted ranking on a number of factors, many of... And a scoring. Mr. Lawrence ranked one out of 10. Mr. Morgan ranked nine out of 10. Petitioner says that Fury was listed as a reference on Mr. Lawrence's application, but there's no evidence in the record that the references were ever consulted. The evidence is that Ms. Eisele, with Mr. Morelli, developed this process with a selection panel in the interviews. And that even if, as the AJ found, Petitioner had proved that his whistleblowing four years earlier, which is far too attenuated in time under the timing element, as the AJ found, even if he had established that, that the agency established by clear and convincing evidence that it would have taken the same action anyhow. Mr. Lawrence's application was very thorough. It was geared towards the ranking factors. Mr. Morgan's application submitted his experience up to August 94. The recent two years of his experience were never even listed. His training was very cursory, was basically in computer applications, whereas Mr. Lawrence had listed a wide variety of training, including a one-year intensive course on excellence in government leadership managerial training. Mr. Lawrence's training showed that he was technically up to speed on the state-of-the-art technical issues, whereas Mr. Morgan's listing of his training showed a very sparse training record indeed. One of Petitioner's arguments is that he would have been a supervisor, but the MSP's decision at Appendix 325 on the earlier whistleblowing case basically as a remedy said that the agency needed to place him as a supervisor or a team leader. So his argument that he necessarily would have been a supervisor... He accepted the team leader slot. Absolutely, Your Honor. There was a settlement agreement in which he accepted that team leader position. So the... If you were selecting a person for this position, wouldn't one ordinarily check with their references? You know, if somebody applies to be my law clerk and they give me four references, I check the references. Often, I believe, Your Honor, that's the case, but there's no evidence here that Ms. Eisele checked the references of anyone. That was not... There was no evidence in the record. I think from Mr. Morgan's point of view, they probably... She didn't need to check the references because she knew from the signal, the sort of the hand jive. If Fiore says this is the fellow, then that's the fellow, which means not Morgan. There's absolutely no evidence, Your Honor, that Mr. Fiore was fatal to their case. The AJ issued a subpoena for Mr. Fiore to testify, but Petitioner never called him as a witness and never pursued that. That was a deliberate decision on his part not to call him. Petitioner argues that why call him, he would just say X. But at a hearing, witnesses are subject to cross-examination, and that is exactly what cross-examination is all about, to explore what it is a witness is saying and to explore the credibility. The AJ found that Ms. Eisele was very credible. Petitioner does not even challenge the credibility of Mr. Morelli, the deputy who ran the whole selection panel process. Petitioner argues that Fiore led this whole reorganization, but the evidence is that while Mr. Fiore may have been the vision leader for this apparently massive reorganization of the agency out in Nevada, it was Mr. Vaith, Ms. Eisele's immediate supervisor, who implemented the reorganization and particularly the selection for this position here. So again, at Appendix 496 to 99 is where Mr. Morgan admitted towards the end of his testimony that he had no evidence about any Fiore knowledge about the whole selection for this position. The AJ found that the timing, four years, was too attenuated, and there's no authority that Petitioner cites for a time period that long would satisfy the requirements. And in any event... Was it four years? It was about four years. The protected disclosures were in 1990 to 92, and the selection for this position at issue in this case was in April of 96. And in any event, there's also abundant credible evidence that the agency would have taken the same action anyhow in selecting Mr. Lawrence. He was clearly so well qualified. Just as a matter of curiosity, really, what's the reason for this extraordinary delay between the selection and the MSPB proceedings? Is that because of the pendency of the district court action? No, Your Honor. The selection... There was a district court proceeding. There was a district court proceeding on the EEO, but ultimately the delay was because Petitioner filed with the Office of Special Account... Office of Special Counsel on this particular April 96 selection until 2001, after the MSPB proceedings were completed in the first whistleblowing case, including a couple of MSPB proceedings on petition for enforcement and remedy. So that was... Is there some reference in the record to Mr. Warren having suffered an injury, an accident? Uh, yes, I believe that that was after he filed with the Office of Special Counsel in 2001. Thank you. We respectfully request that the court affirm the decision of the MSPB. Thank you, Ms. Redding. Mr. Shackelford. Thank you. Just for the record, I actually represented Mr. Morgan in his first hearing in 1995, I think it is, so I've aged with the case also. Just to show you how frustrating the case is, Ms. Eisele swore that Mr. Fiori was not her supervisor, and we produced a document, which is 315, which is her evaluation. And it's dated 4-30-96, which is the month that this literally happened, and it has Joseph Fiori in her signature. And so, I mean, for whatever reason, he was involved in, he being Mr. Fiori, in her supervision, whatever... Well, that's not inconsistent, is it, with his being her second level supervisor? And rating officials in the government can be anyone who's above you in the chain of command. Well, but Vaith was above Fiori. I thought it was the other way around. No, Vaith is the high guy, and Fiori was below him. I thought Mr. Vaith was... But didn't Ms. Veneman just, well, maybe we have an issue of fact, but Ms. Veneman just told us that Mr. Vaith was Ms. Eisele's immediate supervisor. That's wrong? Well, that was one of the disputes. But in the organization in Las Vegas, Vaith is above Fiori. Now, whether she reported directly to Vaith or directly to Fiori was the core of the questions we had. But I said, I mean, she testified, no, Fiori never did anything to me. He never evaluated me, never talked to me. And yet we have signed documents where he's signed... What page were you on? 315. Thank you. So, and then, again, back again to the ranking factors. I mean, here's the interview packet that Terry Vaith set out. Vaith was the acting manager of Nevada. And this tells how they're supposed to do the evaluations for selections. And he says on page 188, do not use numerical rankings. This is legally equivalent to a test and that may not be used. So when they come into the hearing and say, okay, we ranked their body and your guy's number nine, even though they've said they're not going to use rankings, that raises questions to us as far as how do they compare Thornton with Morgan? I mean, admittedly, on some type of formula, Thornton looked better to some people. But to say that he was number nine and Thornton was number two or whatever was illegal according to their own testimony. But even accepting the position that everyone knew more than they wanted to say they knew, don't to prevail, don't you have to show that Morgan would have gotten the job? Yes, Your Honor. By clear and convincing evidence, they have to prove that they would have, somebody else would have been selected otherwise. Anyway, but... That's very hard to do, isn't it, on the record that's been provided? Well, and that's where the question comes in. I think we prove that it wasn't clear and convincing as far as Mr. Lawrence, because we should, at least if you accept our argument, which because Lawrence was basically pre-selected by Fiore and put in that job, which we argue is because he didn't want Morgan. That, again, is based on a number of inferences that you want us to draw out, really out of space, not out of testimony. Well, out of paper documents and history and including the detail which he had been found to have, Fiore had detailed Morgan in 94 out of the engineering department, which was an act of retaliation according to the first decision. But again, admittedly, no one said we're going to do this. But the question is then, again, just assuming hypothetically that we show that Lawrence Are there any cases that, other than this one, in which someone was a successful whistleblower and then later on was able to establish they were successful again with the same person, you know, having the animus towards them? What I'm trying to get at is that one might think that once Mr. Fiore got his knuckles wrapped, that he got the message. Well, or conversely... Any action taken against him as a result of his whistleblowing earlier? Well, one other thing you need to remember is the decision in this case where his knuckles were wrapped didn't happen until after this selection. It happened in November of 96. And this incident was in April of 96. So that's one of the confusing things. He had been testified. He'd been accused of being a retaliator. We'd had the hearing. But the judge had not actually found that he was doing it. So theoretically, he still had the animus but had never been told, look, you can't do anything to this guy because your animus is improper. Okay. Any more questions? Any more questions?  Thank you, Mr. Sagerboom. Thank you very much. And Ms. Vanneman. The case is taken under submission.